THE TOWN OF KEARNY ET AL. v. THE MAYOR AND ALDERMEN OF JERSEY CITY ET AL.

Argued February 23, 1909—Decided June 7, 1909.

1. Jersey City is entitled to take water from a reservoir at Boonton through a pipe line under a contract which provides that no water shall be sold or furnished to any other person or municipality from any point on the main pipe line between the intake at Old Boonton and the Bergen reservoir at Jersey City, the pipe line being intended for the exclusive use of Jersey City; and that no water shall be furnished by the contractor to any consumer of Jersey City water. *Held*, that Jersey City controls water works within the meaning of the act of 1897 (*Pamph. L.*, *p.* 232), and

is thereby empowered to contract to supply a private corporation with water within the bounds of the adjoining municipality of Kearny.

2. The board of street and water commissioners of Jersey City is the governing body of the city with respect to water, and a contract made by it under the act of 1897 (*Pamph. L.,* p. 232) does not require the assent of any other board.

3. The word "corporation" in section 1 of the act of 1907 (*Pamph. L.,* p. 676) means a private, not a municipal, corporation.

4. Section 2 of the act of 1907 (*Pamph. L.,* p. 676), which prohibits the obtaining of water from an outside source by means of pipes and conduits without the consent of the board having charge of the public water-supply within a municipality, applies only to municipalities which maintain or operate an adequate water-supply and stand ready to furnish water to the consumer.

On *certiorari.*

Before GUMMERE, CHIEF JUSTICE, and Justices SWAYZE and PARKER.

For the prosecutors, *Gilbert Collins* and *Robert H. Mc-Carter.*

For Jersey City, *Warren Dixon.*

For the Pennsylvania Railroad Company, *James B Vredenburgh* and *Albert C. Wall.*

The opinion of the court was delivered by

SWAYZE, J. The question in this case is the validity of a contract made by the board of street and water commissioners of Jersey City, by which the city agreed to obtain and supply to the Pennsylvania Railroad Company during a continuous term of twenty-five years from January 1st, 1908, all the water which the railroad company desired to purchase for use within the county of Hudson outside the limits of Jersey City. The object was to secure a supply of water for what are known as the Meadows shops, which are situate on the edge of the territory of the town of Kearny, remote from the rest of the town.

We pass over the objections raised to the right of the prosecutors to maintain this suit and the question of laches in applying for the writ, for the reason that we think the case ought to be disposed of in favor of the defendants upon the merits. The contract is questioned on three grounds—*first,* lack of power in the city to make it; *second,* improvidence in its terms; *third,* that it is in contravention of the act of 1907. *Pamph. L., p.* 676.

We think power to make the contract was given to the city by the act of 1897. *Pamph. L., p.* 232. That act makes it lawful for the governing body of any municipal corporation owning or controlling water works to make a contract with any adjoining municipal corporation or with any private corporation therein to furnish a supply of water for a term of years. Kearny adjoins Jersey City and it is not questioned that the Pennsylvania Railroad Company is a private corporation therein within the meaning of the statute. The question raised is whether Jersey City owns or controls water works. There is no doubt that it owns the old pumping station at Belleville, now disused, and the pipe system needed for the distribution of the water, and also the Bergen reservoir. We agree, however, with the contention of the prosecutors that the power ought not to be rested on these facts. That would be following the act in its letter but not in its spirit. We think that when the legislature gave this authority to vend water to a municipal corporation owning or controlling water works, it intended to confer the power upon those municipalities, and those only, that had an available water-supply. We agree also that in view of the existing pollution of the Passaic river, which made necessary the abandonment of the source of supply at Belleville several years since, the power of Jersey City cannot rest upon the possibility of its obtaining water at that point. It must therefore rest upon the right of Jersey City to the new supply from the Boonton reservoir. We are therefore called upon to determine whether Jersey City owns or controls that water-supply.

The decree in the suit brought by Jersey City against the Jersey City Water-Supply Company for specific performance

of a contract for the new Boonton water-supply was made June 4th, 1908; that is, after the contract between Jersey City and the Pennsylvania Railroad Company now in question. The decree directs a conveyance upon payment of a price to be ascertained by making certain deductions from the contract price, which deductions are to be thereafter ascertained; but the decree provides that in the event that Jersey City fails to make the requisite payment within four months after the amount has been ascertained, its right to purchase the water works shall be terminated and the water-supply company may apply for a dismissal of the bill. In view of this provision of the decree, we think the ordinary rule which holds the vendee under a contract of sale to be the equitable owner of the property is not applicable. This conclusion does not dispose of the present controversy. The act of 1907 empowers not only municipal corporations that own water works, but those that control them to make contracts. This provision applies to the present situation. By the original contract for the Boonton supply between Flynn and Jersey City, the city is entitled to take the water by the million gallons, as she has done continuously now for several years, and as long as that condition continues the contract provides that "no water shall be sold or furnished by the contractor to any other person or municipality from any point on the main pipe line between the intake at Old Boonton and the Bergen reservoir at Jersey City, said pipe line or lines being intended for the exclusive use of Jersey City; nor shall any water be furnished from any water works by said contractor to any consumer of Jersey City water." This provision gives Jersey City the exclusive right to the water, and it is no stretch of language to hold that one who has the exclusive right to the water has the control, and since no water can be furnished from the water works to any consumer of Jersey City water, the city could no doubt enforce this negative covenant by proceedings in equity. Such exclusive right and the power to shut out other consumers amount to control. One of the objects of the act of 1897 was no doubt to make available for public use water that otherwise would be wasted, and it was natural

for the legislature to empower a municipality which controlled the supply to vend the water outside as well as within its municipal limits. Control is used in this act as contrasted with ownership; it does not connote an actual possession, but the right to the usufruct. This Jersey City has to the full extent. We do not accede to the view that the language referred to was meant to limit Jersey City to the use of this water for its own inhabitants. The provision was intended to benefit, not to restrict, Jersey City. The language itself is taken from the specifications embodied in the original proposal of Jersey City for bids, and we can hardly persuade ourselves that anyone ever supposed it to be a limitation of the city's rights until this suggestion was brought out by the stress of the present case. But even if we adopt the view for which counsel contends with evident sincerity, it does not follow that water needed by Jersey City to carry out its contracts is not supplied for the exclusive use of Jersey City. No one would contend that the water was to be supplied for municipal purposes only; it was intended for a public water-supply to be sold for the most part to consumers other than the city itself, and we can see no difference in this respect between the Pennsylvania Railroad Company which receives the water in Kearny and the Erie Railroad Company and the Central Railroad Company which receive their water in Jersey City. If the city is authorized to sell by the act of 1897, the provision of the contract that the supply is for the exclusive use of Jersey City does not stand in the way.

Section 2 of the act of 1897 enacts that where the water works are under the control of a board of water commissioners, no contract shall be made for a term exceeding three years without the consent of the governing board of the city owning said water works. It is urged that this section invalidates the present contract, which was not assented to by the board of aldermen. Section 2 evidently applies only to a city which owns its water works, and that is not the present case. If this view is too narrow and lays undue stress upon the words with which the section closes, the same result is reached by taking the broader view of the peculiar powers of

the board of street and water commissioners in first-class cities. These powers under the act of 1891 (*Gen. Stat., p. 465, pl. 39*) and the amendment of section 2 (*Pamph. L. 1897, p. 248*) are very different from the powers of a mere board of water commissioners in the ordinary sense. It was said by the Court of Errors and Appeals in *Oliver* v. *Jersey City*, 34 *Vroom* 634, that "the board of street and water commissioners is the governing body of Jersey City, and it enacts all the local laws of that city respecting streets and water." Counsel for the prosecutors in the opening of one of the briefs speaks of this very contract as "the action of the governing body of Jersey City," and we think he accurately characterizes the board of street and water commissioners. The resolution did not require the consent of any other board.

We cannot say that the contract is improvident. Even if the price at which the water is sold to the railroad fails to make proper compensation for the cost of the plant and the expense of maintaining the water department, it does not follow that the bargain is a bad one for the city. It enables the city to dispose of millions of gallons of surplus water that would otherwise go to waste, and the increase in the amount of sales decreases the average cost per million gallons of the whole. The price to be paid by the railroad is very much more than the price paid by the city for the water alone. Whether the contract makes a sufficient allowance to cover the other items of cost of delivery is a matter of business judgment which perhaps does not admit of nice mathematical calculation, depending as it does on various uncertain elements. We are not to substitute our judgment for that of the municipal authorities unless the contract is clearly improvident, and that is not proven.

We think the act of 1907 (*Pamph. L., p. 676*) does not sustain the position of the prosecutors. Section 1 forbids any person, firm or corporation to supply water to any other person, firm or corporation for use within the municipality without the consent of the board having charge of the water-supply. The collocation of corporation in this section with the words "person" and "firm" indicates that a private corpora-

tion and not a municipal corporation is meant, and the general usage in our statutory language, which makes a distinction between corporation and municipal corporation, supports this construction.

Section 2 of the act does not make it illegal to contract for a supply of water from a source outside the municipality; what it forbids is the obtaining of water from an outside source by means of pipes and conduits by a corporation within the limits of the municipality without the consent of the board having charge of the public water-supply within the municipality. No penalty is imposed for a violation of this section. It is not declared in specific terms illegal, and the only remedy given by the act is an action at law or in equity to enjoin the violation of its provisions. A corporation in a case within this section which chooses to make such a contract may perhaps be exposed to the risk that it never can obtain the water contracted for by reason of inability to secure the necessary consent of the municipality within whose limits it is doing business, but that consent is not made a condition precedent to the right to contract. It may even be doubtful whether the legislature has the constitutional right to make a contract for the purchase of water dependent for its validity upon the consent of a third party. The right to prohibit, as this statute does, the obtaining of water by means of pipes and conduits, if it is to be justified, must rest upon the fact that ordinarily those pipes and conduits are placed in the public streets of which the municipality has control. Whether the legislature can go further and prohibit one who buys water outside the municipality from bringing it within the municipal limits by means of pipes and conduits laid wholly on private property, is a question that does not now call for discussion. If such an exercise of power is to be sustained, it must be upon the theory that the legislature has the right to give a municipality the monopoly of the supply of water within its bounds—a right which was sustained in the case of a private water company. *New Orleans Water Works Co.* v. *Rivers,* 115 *U. S.* 674. Such a monopoly could probably only be sustained in a case where the munici-

pality itself stood ready to furnish an adequate supply. Fortunately, however, we are not now called upon to pass upon this question of legislative power. Section 2 of the act of 1907 applies only to municipalities maintaining or operating a public water-supply. A water-supply necessarily connotes an adequate supply—a supply which will enable the consumer to obtain water from the municipality. Anything less than that would be, as to the particular consumer, no supply at all. That this must have been the legislative intent is made clear by the language immediately following, which speaks of the "supply of water furnished by the municipality." This must mean the supply which the municipality itself stands ready to furnish. Unless we adopt this construction, the statute would operate to deprive consumers of this prime necessity at the will of the local board, for they cannot get it of the municipality within whose limits they are because it is unable to supply them, and they cannot get it elsewhere, except possibly in barrels or bottles, because the local board refuses its consent. The facts of the present case make the statute inapplicable. On April 22d, 1908, when the contract before us was made, the town of Kearny was unable to furnish any supply whatever to the railroad at the Meadows shops—a most important point for the railroad to obtain water; so important apparently, under any existing arrangements, that a failure to obtain an adequate supply at this point might paralyze the interstate traffic over hundreds of miles of track. The town had a public water-supply at that time, bought from the water companies; whether it was adequate for the necessities of the railroad is a disputed point, but immaterial, since the town had no pipe by which it could supply the water. The meadows shops were several miles from the Kearny water system. The right to supply the railroad had been expressly reserved by the water companies in their contracts with Kearny, and the necessary pipe line belonged to the companies, or one of them. It was not until December 28th, 1908, that the water company waived its reserved right to sell water to the railroad and consented that the pipes of the company might be used as part of the

public water-suppy system of the town of Kearny for the purpose of delivering water therefrom to the Pennsylvania railroad at the meadows shops or elsewhere. This was more than eight months after the contract between Jersey City and the railroad company, now questioned. It was, however, only five days after Kearny had resolved to take legal measures to prevent the introduction or continuance of any water-supply to the railroad from any municipality or water company other than the supply provided by the town. The agreement between the water company and Kearny of December 28th was the result of a proposal made by the water companies to the town on December 23d and accepted by the town on that day. It is evident that agreement was the result of an attempt on the part of the water companies to regain, indirectly, through the medium of the town, the right to supply the railroad, which they had lost in 1906. The situation then is this: When the contract between Jersey City and the railroad company was made, Kearny was unable to supply the railroad with any water whatever. As to the railroad company, Kearny did not maintain or operate a public watersupply. Her operations were confined to a part of her territory quite remote from the Meadows shops. The act of 1907 did not therefore apply and the contract is not vitiated. We need go no farther.

All that is before us for review is the resolution and agreement of April 22d. They were within the power of Jersey City to adopt, and the proceedings are therefore affirmed, with costs.